(C.D. 2470)

J. L. Wood *v.* United States

United States Customs Court, Third Division

(Decided June 30, 1964)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff. *John W. Douglas*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the defendant.

Before DONLON and RICHARDSON, Judges

DONLON, Judge: The issue here is whether certain acoustical mineral tile, imported in 1960 from Canada, was correctly classified by the collector as earthy or mineral substances, manufactured, decorated, under paragraph 214, Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade (T.D. 54108), with duty as such at the rate of 34 per centum. Plaintiff's protest claims that these tiles should be classified under that same paragraph, as modified by the General Agreement on Tariffs and Trade (T.D. 51802), as earthy or mineral substances, manufactured, not decorated in any manner, with duty as such at the rate of 15 per centum.

The issue, then, is limited to the question whether these acoustical tiles are or are not decorated, in the tariff sense. Plaintiff contends that they are *not* decorated. Defendant says that they are decorated.

The two competing provisions of paragraph 214, as modified, are as follows:

Paragraph 214, as modified by T.D. 54108:

Earthy or mineral substances wholly or partly manufactured and articles, wares, and materials (crude or advanced in condition), composed wholly or in chief value of earthy or mineral substances, not specially provided for, whether susceptible of decoration or not:

 \* \* \* \* \* \* \*

 Other, if decorated (except synthetic materials of gem stone quality, such as corundum and spinel, and articles and wares composed wholly or in chief value of such materials).

Paragraph 214, as modified by T.D. 51802:

Earthy or mineral substances wholly or partly manufactured and articles, wares, and materials (crude or advanced in condition), composed wholly or in chief value of earthy or mineral substances, not specially provided for, whether susceptible of decoration or not (except synthetic materials of gem stone quality, such as corundum and spinel, and articles and wares composed wholly or in chief value of such materials, and except marble chip or granite):

 If not decorated in any manner:

 \* \* \* \* \* \* \*

 Other \* \* \*.

On trial in Fargo, N. Dak., the two protests were consolidated. Plaintiff adduced the testimony of Mr. Felix G. Janssen, who identified himself as vice president of United States Perlite Corp. of Momence, Ill., manufacturer of acoustical tile. He is now (since April 1961) in charge of all its manufacturing operations. From February 1957 to January 1961, including the period of this importation, Mr. Janssen was with Supercrete, Ltd., in charge successively of "building the plant, bringing it into production, supervising the production, and selling the production of acoustical tile, of an acoustical tile plant in Canada, St. Boniface, Canada." (R. 3.) This was Supercrete, Ltd., exporter of the instant merchandise. On cross-examination, defendant elicited the fact that Mr. Janssen was "associated with Decortone Company in Canada" and that it is the manufacturer of the merchandise here in issue.

If the relationship of these concerns to one another and to Mr. Janssen has been shown, it is not easy to spell out such showing. Nor does it appear that the official papers were put into the record. It is known, of course, that plaintiff is a customs broker.

Notwithstanding this failure of complete identification of Mr. Janssen with plaintiff, he testified extensively as to the manufacturing processes of acoustical tile generally, and of this tile in particular. He identified specimen tiles which were received in evidence.

Defendant adduced the testimony of Mr. Dennis O. Bakke, who stated that he is, and since October 1958 has been, an acoustical sales engineer for the Wood Co., otherwise identified by Mr. Bakke as Wood Conversion, manufacturer of mineral acoustical tile. Mr. Bakke lives in St. Paul, Minn., but the location of his employer is not stated.

Defendant also introduced into evidence a pamphlet (exhibit A) described, on the front cover, as a "Technical Bulletin for Architects and Consulting Engineers" as to "Decortone, the fire rated Acoustical Ceiling Tile." On the back cover, it is stated that Decortone is manufactured by Decortone, Ltd., a division of Supercrete, Ltd., St. Boniface, Manitoba. On cross-examination, plaintiff's witness Janssen identified this as a booklet circulated by the Decortone Co. "to the industry." (R. 16.)

Mr. Janssen described the process of manufacture as follows:

We took perlite, which is a volcanic rock, and put that in a mixture where it was treated to render it waterproof. After that treatment it was put in another mixture where it was mixed with a binder, after which process it was moved to a forming machine, which did various handlings. First of all, there were 7 moulds—or actually I should say there were eleven moulds—on an endless chain. The moulds were filled by volume. After being filled by volume they were pressed under a press—10 tons of pressure—and after the pressing they were lifted out

and deposited in a drying oven. After the drying process they were processed in a kerffing machine. The kerffing machine actually sizes the tile accurately. It makes a groove in the tile to install it on mechanical suspension systems, and it makes a back-cut on the tile to offset metal behind the ceiling. After the kerffing process, the tile is painted, and inspected, and packed, and then it's ready for shipment. [R. 8–9.]

The witness explained that the purpose of painting was to level off the color and to improve the light reflectivity of the tile. (R. 9.)

The samples received in evidence are composed of a light porous material, white in color (exhibit 1). They measure 12 inches by 12 inches by seven-eighths of an inch. On one sample, there are four V-shaped grooves on the top surface, one starting from each edge, about 2 inches from the left-hand edge and running parallel to it for about 6 inches. The grooves are less than ¼ of an inch deep and are about ¼ of an inch wide at the edge. They taper off to a point toward the center. The other sample has over a dozen narrow grooves, varying in length, all running parallel and not starting at the edges, but starting at various distances from the edges. None of these grooves runs the full length of the tile. The backs of the samples have larger indentations, about an inch wide, which run nearly halfway across the tile.

Mr. Janssen called the grooves on the front surface "breaks" and stated that they are pressed in during the forming of the material, while it is still in the mold. (R. 10–11.) He said that the breaks, or lines, are put in for acoustical reasons, in order to enlarge the surface area so that the sound wave has a larger area on reaching the tile. (R. 11–12.) He caused tests to be made as to the acoustical properties of tiles with lines, as compared to those without lines, and the results showed that tile with "breaks" was considerably better, acoustically, than tile without "breaks." (R. 12.)

Mr. Janssen testified that, in his opinion, the two tiles in plaintiff's exhibit 1 are not decorative; that architects preferred tile without "breaks"; that "breaks", or lines, do not increase beauty of the tiles nor add grace, nor make them elegant, nor add to their market value. (R. 13–14.)

Mr. Janssen explained that the physical properties essential for the success of an acoustical tile include porosity, arranged in such a way that low frequency, middle frequency, and high frequency sound waves are arrested by friction in passing through the tile. Other characteristics are sound absorption, sound attenuation, surface flame resistance, fire retardation, and light reflectivity. (R. 14–15.)

On page 1 of exhibit A, the second illustration shows three tiles: One is without any surface marking; one has a series of parallel lines, not quite the same as the lines on the tiles of plaintiff's exhibit 1; and the third has four grooves, similar to one of the tiles in plaintiff's

exhibit 1. In a column next to the pictures, there are descriptions under such headings as "Completely Incombustible," "Decorative," "Economical," and "Dimensional Stability." Under the heading "Decorative," it is stated:

Velvet white DECORTONE features a natural, dimensional texture that will compliment and enhance any interior. With the wide selection of plain or imaginatively-patterned DECORTONE tile you can create a stylish wall or ceiling application that will blend with any architectural conception. DECORTONE can also be manufactured in a pattern of your own design. * * *

According to Mr. Janssen, the noise reduction coefficient of acoustical tile is determined by sound absorption tests of the tile, taking the results obtained for the four middle frequencies, adding them together, and dividing by 4. (R. 23–24, 30.) The NRC (noise reduction coefficient) figure is taken as the nearest 5. (R. 31.) On pages 3 and 4 of defendant's exhibit A, there are reports of sound absorption tests of both plain and striated tile. (R. 23–24.) They show the following:

| | COEFFICIENTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | 125 | 250 | 500 | 1000 | 2000 | 4000 | NRC |
| Decortone Plain | .74 | .74 | .64 | .68 | .76 | .76 | .70 |
| Decortone Striated | .80 | .82 | .64 | .69 | .72 | .79 | .70 |

Mr. Janssen pointed out that the tests show that, particularly in the low frequencies, the striated tile has 6 to 8 percent better absorption value. (R. 26.) He said that, although the plain and striated tiles apparently have the same NRC, that lifts a conclusion out of context; that an architect wants to see all the figures, because he is interested in noise reduction that takes into consideration all frequencies. (R. 31–32.) Witness Janssen admitted that the specifications advertised in the booklet, defendant's exhibit A, include NRC of .70 for both plain and striated tiles, when consideration of different cycles is excluded. (R. 28–29.)

The issue as to what is and what is not decorated, in the tariff sense, has been before the court often. An article may, of course, be decorative without being decorated. The terms are not synonymous, although witnesses here sometimes spoke as if the terms were interchangeable.

In *Otagiri Mercantile Co., Inc.* v. *United States*, 44 Cust. Ct. 184, C.D. 2173, we held that Japanese stone lanterns, although decorative, were not decorated articles. Discussing that difference, we said:

It is evident that stone lanterns are artistic and are ornaments designed to fit into a special type of landscape or garden. However, the particular lanterns here involved are not themselves decorated since they have no embellishments carved or painted upon them nor has anything been added to the stones once they were chiseled into the shapes desired. While they may be said to be fancifully fashioned, they are not decorated or ornamented. We do not think the

slight recessing on the shaft and on the light chamber of plaintiffs' exhibit 4 is sufficient to make that article a decorated one. [P. 192.]

In *International Lapidaries Co.* v. *United States*, 36 Cust. Ct. 230, C.D. 1780, it was held:

A diamond, or any other jewel, cut, faceted, and polished to bring out its beauty, while used for a decorative purpose, is not commonly considered to be itself decorated. That term applies to stones which have been engraved or carved with designs, such as cameos, seals, or scarabs. [P. 234.]

Decoration need not be the result of a superadded process. It may be placed on the article simultaneously with the manufacturing process. *United States* v. *Todd & Co.*, 11 Ct. Cust. Appls. 50, T.D. 38690; *W. X. Huber Co.* v. *United States*, 57 Treas. Dec. 196, T.D. 43827; *United States* v. *Mutual China Co.*, 9 Ct. Cust. Appls. 232, T.D. 38202. The controlling factor is whether, in ordinary acceptance of the term, the article is, in fact, decorated. *Koscherak* v. *United States*, 98 Fed. 596; *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 CCPA 24, C.A.D. 209.

Each case is to be determined with reference to the particular article involved. We have found no cases dealing with acoustical tile. However, there are guidelines for us in the cases we now proceed to discuss.

In *United States* v. *Mutual China Co.*, *supra*, white earthenware articles had depressions, raised lines, or indented edges that were barely discernible, or crude, irregular, and infinitesimal variations from smooth edges and surfaces, all done in the mold or with a stylus. Four exhibits showed variations that were not noticeable by a casual glance, but which were observable upon close inspection. The court pointed out that it is not every minute appearance of ornamentation or decoration, nor every deviated line or undulated surface, that can be said to be a decoration, however pleasing to the eye. The articles were held not to be decorated. In the course of its opinion, the court quoted from the decision below of the Board of General Appraisers which pointed out, not only that the indentations were of an inconsequential character, but that the testimony established that the merchandise was known in the trade and commerce of this country as *plain* white earthenware.

In *Absorbo Beer Pad Co., Inc.* v. *United States*, *supra*, pulpboard had a slightly scarred or roughened surface, caused by minute depressions that were made during manufacture. They were straight, depressed lines, at regular intervals. At a distance, the board appeared to be plain. The depressions or pinpricks were due to a wire-mesh screen that was used to carry the pulp mass and permit drainage. The court held that this pulpboard was not decorated, saying:

It is our view that the so-called blurred effect given to the surface of the boards at bar, which effect can be observed only by close inspection, cannot

properly be regarded as an ornamentation or decoration, or as embossing, within the meaning of the provisions of paragraph 1413. [Pp. 32, 33.]

In *United States Envelope Co.* v. *United States*, 60 Treas. Dec. 1071, T.D. 45333, the merchandise consisted of handmade paper, with marks that were visible when the paper was held to the light. These marks were made by perpendicular chain wires and horizontal laid wires, all indispensable components of the screen on which the paper was made. The court held this paper was not decorated, stating:

> The above quotations appear to confirm the testimony of the witness that wire screens are absolutely essential in making paper, especially in the production of handmade paper. Therefore, unless the wires in the screen are arranged so as to outline a decorative or ornamental pattern or design and create that effect upon the paper, the latter can scarcely be said to be a decorated paper. Mere perpendicular lines at certain intervals will not accomplish such a decoration, certainly not when they are so placed solely for reinforcement purposes. * * *

> \* \* \* \* \* \* \*

> Nor does such a paper become a decorated paper merely because some people prefer it to paper which does not show the marks of the screen. * * *

> \* \* \* \* \* \* \*

> In the present paper there is no deliberate purpose to create a design thereon, the perpendicular lines being only faintly discernible when the paper is held to the light. Such an effect on the paper can scarcely be deemed a decoration. [Pp. 1073-1075.]

*Bunker Hill Brick & Supply, Inc.* v. *United States*, 46 Cust. Ct. 95, C.D. 2240, involved broken face and rock face brick, each having a rough texture on one of the faces, caused by the breaking or twisting of a double brick before firing or by the chipping of a common brick after firing. This was known as a type of face brick. The court pointed out:

> * * * An examination of the samples of the involved merchandise discloses that they are all crudely made bricks, each having a rough texture on one of the faces. While this rough texture changes the appearance of the brick from that of a smooth brick and may be attractive to some, it is not in the form of a pattern or design or other embellishment. To the eye of the observer, such brick is not "decorated" or "ornamented" within the common meaning of those terms: To increase in beauty by the addition of something becoming or beautiful, to add grace or beauty, to embellish, to make beautiful or elegant. (Webster's New International Dictionary.) [P. 102.]

The court examined the legislative history of the provision covering brick, said it was well known to Congress and to trade agreement negotiators that there are types of brick known as common brick, face brick, and ornamental or decorated brick, and held that the provision in paragraph 201(b) for brick, glazed, enameled, painted, vitrified, ornamented, or *decorated* in any manner was not intended to include ordinary face brick, whether or not possessing a particular finish or texture, but was intended to cover brick which had been processed more

elaborately in shape, texture, and finish, than ordinary face brick is processed. Therefore, the merchandise was held dutiable as brick, *not decorated* in any manner.

It appears that the manufacturer of these tiles makes plain tiles, without any grooves or markings, and also makes tiles, such as those of plaintiff's exhibit 1, which have noticeable grooves or striations. Witnesses testified that other manufacturers make tile having gold-leaf, gold speckles, or flowery designs, and that tile can be orna-mented by the use of colored coatings, painting, embossing, or press-punching. While the three tiles seem somewhat similar to the three types of brick involved in the *Bunker Hill Brick* case (that is, common brick, face brick, and decorated brick), there is no evidence or any legis-lative history to indicate that three types of tile were well known to Congress, or in the trade, or that it was intended that striated tile can be classified as not decorated. There was such evidence as to bricks.

While minute or barely discernible markings or indentations do not constitute decoration, nor do markings necessitated by the process of manufacture itself, the cases cited and reviewed indicate that where lines or markings are arranged to form a pattern or design or other embellishment, the articles are decorated.

Plaintiff claims that this imported acoustical tile is not decorated because the breaks, grooves, or striations were placed thereon only for acoustical purposes. Mr. Janssen testified to this effect, and he stated that tests were made at regular intervals which showed that the tiles with "breaks" were considerably better acoustically than were the tiles without "breaks." This testimony is supported to a limited extent by some of the test results shown in defendant's exhibit A, namely, that the sound absorption of striated tiles is higher in cer-tain frequencies. The actual average, even of the four middle fre-quencies, is slightly higher for striated tile; but the NRC is the same, because of the practice of using the lowest multiple of 5. According to Mr. Janssen, architects would take into consideration all frequen-cies, not only the noise reduction coefficient. However, no architects were called to testify. Furthermore, the only test figures in the record are for "Decortone Striated." The evidence before us does not show whether these figures are test results for the imported tiles, which have two different sets of markings, or whether they apply to a third type of striated tile that is depicted in defendant's exhibit A, but which is not before the court in this litigation.

Mr. Janssen testified that the grooves did not increase the tiles in beauty, grace, or elegance and also that architects objected to the breaks. However, no testimony of architects or decorators was offered. On the other hand, the statements in defendant's exhibit A (pamphlet illustrating Decortone tiles), to the effect that there was available

a wide selection of plain or imaginatively patterned tile with which to create a stylish wall or ceiling, seem to indicate that the manufacturer considered the grooves to be a decoration, or embellishment, and used that as a sales "pitch" in offering the tiles to customers. Examination of the samples in evidence discloses that the markings are easily discernible; that they form patterns which might make a wall or ceiling more attractive than a plain white wall or ceiling might be. The grooves are not crude. They are neatly and carefully made. The record shows that there were at least three different patterns, besides the plain tile. Defendant's exhibit A indicates that there might be still others. There is nothing in the record to show that different patterns had different acoustical values. Therefore, the reason for producing them in different patterns would appear to be that customers were offered a variety of designs from which to make their selection. Since tiles could be produced either with or without grooves, the striations were not an unavoidable result in the manufacturing process, as in *Absorbo Beer Pad Co., Inc.* v. *United States, supra; United States Envelope Co.* v. *United States, supra.*

The weight of evidence presented does not establish that the only purpose of the grooves was to increase the sound absorption of the tile, or that the grooves had substantial acoustical effects. The grooves were in various designs or patterns, which made the tile more attractive, and tile was sold on the representation. Although there may have been tile with more elaborate ornamentation, these markings are, in fact, decorations, in the ordinary meaning of that term. Therefore, the merchandise is subject to duty at 34 per centum ad valorem under paragraph 214 of the Tariff Act of 1930, as modified, *supra*, as earthy or mineral substances or articles in chief value of such substances, decorated.

The protests are overruled and judgment will be entered for defendant.